**D. M. PICTON & CO., Inc. v.
UNITED STATES.**
No. 499.

United States District Court
E. D. Texas, Beaumont Division.

May 2, 1950.

Denman Moody, Baker, Botts, Andrews & Parish, Houston, Tex., for libelant.

Warren G. Moore, U. S. Atty., Tyler, Tex., Joseph V. Ferguson, II, District Counsel, U. S. Maritime Commission, New Orleans, La., for respondent.

BRYANT, District Judge.

This is a proceeding in admiralty brought by libelant, D. M. Picton & Co., Inc., in its own behalf and in the alternative, in behalf of and for the use and benefit of certain named insurance companies, referred to herein as The Tugboat Underwriting Syndicate, to recover damages from the United States on account of the sinking of the tug North American in the Sabine-Neches Canal on the morning of August 16, 1948. The tug North American was capsized and sunk as the result of being shoved into the starboard or east bank of the Sabine-Neches Canal while said tug was assisting a Government-owned vessel, the S. S. Brazil Victory.

This libel is brought against the United States under the Suits in Admiralty (Merchant Vessels) Act, 46 U.S.C.A. §§ 741–752, and, in the alternative, under the Suits in Admiralty (Public Vessels) Act, 46 U.S.C.A. §§ 781–799. Libelant has elected to proceed in rem as well as in personam.

This case was tried March 20, 21, and 22. All witnesses for both libelant and respondent testified in person before the Court.

The Court makes the following—

Findings of Fact

1. On August 16, 1948, at about 8:38 a. m., the tug North American was capsized and sunk in the Sabine-Neches Canal. This accident occurred in a bend in the canal at a point approximately one and one-fourth miles below the juncture of the Neches River and the Sabine-Neches Canal, this being a short distance above the old Guard Lock. See U.S.C. & G.S. Chart No. 517 (Sabine Pass and Lake), which is libelant's Exhibit No. 1. The sinking occurred when the tug North American was shoved into the starboard or east bank of the canal as a direct result of the stern of the S. S. Brazil Victory making a sudden and abrupt movement toward the starboard bank, thereby shoving the tug North American,

which was lashed to its starboard quarter, against the bank of the canal.

2. The libelant, D. M. Picton & Co., Inc., was and is a private corporation organized and existing under and by virtue of the laws of the State of Texas, having its principal office and place of business in Port Arthur, Texas and is a resident citizen within the territorial jurisdiction of this Court, D. M. Picton & Co., Inc., at all times material hereto, was the owner and operator of the tug North American. The tug North American, at all times material to this cause of action, was tight, staunch, seaworthy, and in all respects properly equipped and manned.

3. Prior to the accident made the basis of this suit, a valid and existing policy of insurance covering damages to the tug North American had been issued to D. M. Picton & Co., Inc., and said policy was in existence at the time of said accident, by the following insurance companies, operating under the name of The Tugboat Underwriting Syndicate: The Hartford Fire Insurance Company; Aetna Insurance Company; Atlantic Mutual Insurance Company; The Automobile Insurance Company of Hartford, Connecticut; The British & Foreign Marine Insurance Company, Ltd.; Commercial Union Assurance Company Limited; The Connecticut Fire Insurance Company; The Continental Insurance Company; Federal Insurance Company; The Home Insurance Company; Insurance Company of North America; North British and Mercantile Insurance Company Limited; Royal Insurance Company, Limited; Standard Marine Insurance Company, Limited; Universal Insurance Company; Westchester Fire Insurance Company. Said insurance companies, herein referred to as The Tugboat Underwriting Syndicate, by reason of said insurance policy mentioned, and by reason of the damages to the tug North American occasioned by said sinking, paid D. M. Picton & Co., Inc., the sum of $50,000. The insurance policy in question, with the cancelled check for $50,000, was placed in evidence by libelant.

4. The S. S. Brazil Victory was owned and operated as a public vessel by the United States at all times material herein. Said vessel, during the pendency of this suit, has been found within the territorial jurisdiction of this Court.

The tug Watch Hill was owned and operated as a public vessel by the United States at all material times herein. Said vessel has not been found within the territorial jurisdiction of this Court during the pendency of this suit.

5. On April 16, 1948, and at all times material hereto, the weather was clear, visibility was good, there was a flood tide of approximately one-half knot in the canal, and there was a wind from the west of about twelve to fourteen miles per hour blowing across the canal. The Sabine-Neches Canal at the place of the accident, and for at least a mile to the north and south thereof, was approximately 350 feet wide at the bottom and approximately 400 feet wide at the top. The water in the canal was approximately 33 feet in depth.

6. On August 16, 1948, the tugs North American and Bertha II, both belonging to libelant, D. M. Picton & Co., Inc., were employed by the United States to assist in moving the S. S. Brazil Victory up the Sabine-Neches Canal to the lay-up fleet at Smith Bluff, Texas. The S. S. Brazil Victory was a victory-type ship which was light and without cargo, and which had no power of her own. The towing tug Watch Hill, which also belonged to the United States and which was a 2,500 horsepower tug, was towing ahead of The Brazil Victory on a hawser about 200 feet long.

The towing tug Watch Hill had just completed towing The Brazil Victory to the entrance of the Sabine-Neches Canal, and the tugs North American and Bertha II met the towing tug Watch Hill and The Brazil Victory at that point at the jetties. The tugs North American and Bertha II were to be used to assist in steering The Brazil Victory while the towing tug Watch Hill pulled ahead on a hawser. When the tugs North American and Bertha II met The Brazil Victory at the jetties, those in charge of the navigation of The Brazil Victory ordered the tug North American to take its position at the starboard quarter of said vessel and ordered the tug Bertha

II to take its position at the port quarter of said vessel.

7. Those in charge of the tugs North American and Bertha II had no part in the over-all navigation of the flotilla as it proceeded in a northerly direction by the canal. The tugs North American and Bertha II received all their orders and instructions, including orders as to speed and rudder, from Pilot Carroll and Captain Eversen who were in charge of The Brazil Victory. No instructions or orders were given to the tugs North American and Bertha II from those in charge of The Watch Hill. The position and location of the tug North American on the starboard quarter of The Brazil Victory was such that it was impossible for those in charge of the tug North American to see approaching vessels coming down the canal from the opposite direction, nor could those in charge of the tug North American observe approaching vessels when a port-to-port passing was to be effected.

8. The towing tug Watch Hill was in command of her master and also had a Sabine pilot at her wheel. The S. S. Brazil Victory was in command of her master and also had a Sabine pilot on her bridge. As between the towing tug Watch Hill and The Brazil Victory, there was no understanding or agreement as to who was in over-all command of the flotilla. In fact, there was never any over-all command exercised by anyone either on the towing tug Watch Hill or the tow Brazil Victory. Further, as between the towing tug, Watch Hill and the tow Brazil Victory, there was no method established for the giving of signals one to the other.

9. Made up as described above, the flotilla was proceeding at a speed of about six to eight knots per hour in a fairly straight portion of the canal toward a bend which curved to the left. This was approximately a thirty-five degree bend. As this bend was approached, those in charge of The Watch Hill and The Brazil Victory observed an approaching tanker, The Mobiloil, heavily laden, proceeding down the canal toward said flotilla at a slow rate of speed of about three to four knots. Said Mobiloil was at least a mile and a half away when first observed by those in charge of The Brazil Victory and the towing tug Watch Hill. Because of the tug North American's position on the starboard quarter of The Brazil Victory, those in charge of the tug North American were "blind" and not in a position to observe and did not observe the approach of The Mobiloil and the subsequent port-to-port passing made by the said Mobiloil with The Brazil Victory. The Mobiloil and the tug Watch Hill exchanged one-whistle signals for a normal port-to-port passing prior to passing.

10. The flotilla, without slowing and still making a speed of six to eight knots per hour, proceeded into the bend with the purpose of effecting the port-to-port passing with The Mobiloil in the bend. Said passing was effected with The Mobiloil proceeding on its starboard side of the channel, to the right of the center line, and with The Watch Hill, Brazil Victory, and the assisting tugs proceeding on their starboard side of the channel and to the right of the center line.

For at least ten minutes prior to the collision, the tugs North American and Bertha II, pursuant to direct orders from the Sabine pilot on The Brazil Victory, were going full ahead. Just prior to the passing with The Mobiloil in the bend, Pilot Carroll on The Brazil Victory had ordered the tug North American to go hard left with its rudder. At the very moment of the abrupt change of course of the stern of The Brazil Victory toward its starboard bank, the tug North American, under direct orders from Pilot Carroll, was going full ahead with hard left rudder. At no time did The Mobiloil crowd the flotilla while effecting said port-to-port passing.

11. At the time of or immediately after The Brazil Victory passed The Mobiloil The Brazil Victory suddenly sheered first to starboard and then to port. While The Brazil Victory was sheering to port, the towing tug Watch Hill made an abrupt change of course to its port and pulled the bow of The Brazil Victory even more rapidly to port. The tug North American, from its position on the starboard quarter

of The Brazil Victory, was not in a position to observe this sudden change of course of the towing tug Watch Hill.

This sudden change of course to port on the part of the towing tug Watch Hill greatly accelerated the movement of the bow of The Brazil Victory to port, causing the stern of The Brazil Victory to abruptly go toward its starboard bank. Within approximately one minute thereafter, the tug North American was crushed against the west bank of the canal and caused to capsize and sink. Immediately upon observing that the tug North American was being shoved almost sideways towards its starboard bank, the master of the tug North American ordered his deckhands to cut and let go the lines. Everything possible was done to carry out this order, but the tug was crushed against the bank and capsized before the tug had time to get away.

12. The sheer of The Brazil Victory, augmented as it was by the abrupt change of course to port by the towing tug Watch Hill, placed the tug North American in a position of sudden danger. Those in charge of the towing tug Watch Hill and Brazil Victory failed to timely warn the tug North American that it was being placed in such position of danger, although such timely warning could have been given, and thereby did not give the tug North American any reasonable opportunity to extricate itself from danger before the collision occurred.

Neither the tug North American nor the tug Bertha II, nor those in charge of them, were in any way negligent or at fault with respect to this accident. At all times, those in charge of the tug North American and the tug Bertha II carried out promptly and efficiently all orders and instructions given them by those in charge of The Brazil Victory.

13. This collision, capsizing and sinking of the tug North American was proximately caused by the following faults, omissions and negligence of the United States and those in charge of The Brazil Victory, including Sabine Pilot W. M. Carroll and Captain Even Everson and those in charge of the tug Watch Hill, including Sabine Pilot J. E. Gonzales and Captain George T. Rhodes:

(a) In causing and permitting The Brazil Victory to be steered too close to its right-hand bank.

(b) In attempting to navigate The Brazil Victory around a thirty-five degree bend and at the same time effecting a passing with the heavily laden Mobiloil in said bend.

(c) In attempting to maneuver The Brazil Victory in the bend in question at an excessive rate of speed. The evidence is undisputed that at no time prior to the accident did those in charge of either the towing tug Watch Hill or The Brazil Victory give any order to reduce the flotilla's speed of approximately six to eight knots.

(d) In failing to reduce speed and await until the heavily laden Mobiloil had cleared the bend before attempting to navigate the flotilla around the bend. The evidence is clear that the flotilla could have safely awaited below the bend until The Mobiloil had negotiated same.

(e) In permitting The Brazil Victory to suddenly sheer first toward its starboard bank and then toward its port bank at the time of and immediately after The Brazil Victory was passing The Mobiloil in said bend. The wholly unexplained sheering by The Brazil Victory undoubtedly creates a presumption of negligence and fault against that vessel. The United States has failed to come forward with any evidence to rebut this presumption.

(f) In failing to establish any over-all command as between the towing tug Watch Hill and the tow Brazil Victory, and in failing to establish a method of communication between the towing tug Watch Hill and Brazil Victory. This failure in these two respects resulted in the independent maneuvering of the towing and towed vessels and directly contributed to the collision.

(g) In failing to warn or notify timely the tug North American that The Brazil Victory was to be so maneuvered that her stern would swing suddenly and abruptly to starboard and shove the tug North American into the starboard bank of the canal.

(h) In failing to notify those in charge of The North American of The Watch

Hill's intention to make an abrupt change of course to its port immediately prior to the accident.

14. In so far as this record is concerned, The Mobiloil had nothing whatsoever to do with causing this collision, and its presence was merely a condition and not a causative factor with respect to the sinking of the tug North American.

15. The log entries of the towing tug Watch Hill and The Brazil Victory concerning this accident are of particular significance, for they contain no exculpatory explanation as to why the tug North American was placed in a position of peril without any timely warning. When the bow of The Brazil Victory was suddenly pulled to port by the towing tug Watch Hill, the stern of The Brazil Victory made an abrupt movement toward its starboard bank. If the masters or pilots of either the towing tug Watch Hill or The Brazil Victory had given any timely warning to the tug North American that such movement was to be made, the masters of these vessels would have certainly noted same in their respective logs. No such notation is contained in these logs.

### Conclusions of Law

1. This cause is a libel in admiralty, and this Court has jurisdiction of the parties and the subject matter.

2. Libelant has established its right to proceed under the Suits in Admiralty (Public Vessels) Act, 46 U.S.C.A. §§ 781–799, against respondent, United States. This is an action where if The Brazil Victory and The Watch Hill were privately owned, a proceeding in admiralty could be maintained at the time of the commencement of this action. The vessels Brazil Victory and Watch Hill, at all material times herein, were being operated by the United States as public vessels within the meaning of the said Public Vessels Act.

■ 3. The respondent, United States, is solely liable for the damages caused by the capsizing and sinking of the tug North American, such damages having resulted directly and proximately from the negligence and fault on the part of those in charge of The Brazil Victory and The Watch Hill, including their respective masters and pilots, as set forth above. There was no fault or negligence on the part of the tug North American or tug Bertha II which contributed to this accident. The tug North American did not assume the risk of the faults and negligence of those in charge of the towing tug Watch Hill and Brazil Victory, and the tug North American therefore did not assume the risk of the damages which it sustained.

■ 4. The insurance companies, whose names appear in Paragraph No. 3 of the Findings of Fact above, were and are subrogated by operation of law to all causes of action of D. M. Picton & Co., Inc., for the reason said insurance companies have paid the sum of $50,000 to D. M. Picton & Co., Inc., under said insurance policy. Libelant, D. M. Picton & Co., Inc., the assured under said policy of insurance, is entitled to sue herein as libelant and is entitled to judgment herein against the United States on behalf of and for the use and benefits of said insurance companies.

The damages sustained by the tug North American will be measured in a hearing before a commissioner unless the parties herein can agree on the amount of said damages.

Judgment will enter accordingly.